at all. Arguments not to exceed 15 minutes per side. Mr. Bonnard for appellants. Thank you. I'm here on behalf of the appellants Mark Eurton and Laura Wisman and I would submit to you that this case presents three essential issues. Were the actions of the officers of objectively reasonable? Did anyone need immediate aid that required the forcible entry into the house? And most importantly, as relates to the procedure of this case and where this case is postured, did the facts relating to this entry and this interaction point in only one direction? I would submit to you that they didn't and that we have presented facts that should be presented to a jury for resolution and that's why we're here. So notably, this case concerns what I think all of us would consider our most protected private property or home. And this was in response to a welfare check. And we have seen characterizations in the reports that were filed by the attending police and reports that were done to the department. But fortunately in this case we have the benefit of substantial videos and those characterizations are what they are. But I would say that a jury should be permitted to consider those characterizations in light of what they can see with their own eyes and hear with their own ears. But if we just had the video this would be a little different, but we've got information about what the officers learned on the way. True, and maybe they did, maybe they didn't. That is somewhat of a disputed fact as to who knew what with respect to dispatch. Well what evidence do you have, the officers say, I mean I know that you claim that they couldn't have known anything that came in after the original call, but the officers have submitted additional evidence. Do you have anything to counterdict that? No, I mean I think that's... Well then how is there a reasonable, I mean a jury would have to be able to find that the evidence they submitted is false. I don't believe so, I think that would go into the mix, that's my whole point. Before the forcible entry... But on that particular point you don't have any evidence that countermands their evidence of what they would have known from the dispatch call. Correct, that's correct. All we have is what's in the file and I think those are issues to be presented to the jury, but that's absolutely true. My point is, I think that's in the mix. But you also have to consider when they pull up to the house and you've seen, I assume you've seen the video, but there's no warrant, there's no crime in process, there's no violence, there's no emergency, the interaction they characterize, the police officers have characterized Mark as being stumbling, I think that is... But we're not talking about a crime, I think we all agree on that, right? We're talking about the emergency aid exception. To whom? Right, so there's a test, what is the test? Can you tell me what the best case is or what the test is for this emergency aid exception? So what my... I would say the relevant inquiry, now this is under Awolski, this is under Hoover v. Due, which is 152 Fedforth 749, which is a 2025 case, came out after our briefs, but I think it's instructive. But in there it says, determining whether exigent circumstances existed to justify warrantless entry into house does not depend upon officer's subjective intent, it depends upon whether the officer had objectively reasonable basis for believing that someone inside the house was in need of immediate aid. And so, I think that's subject to dispute, I think the facts point in both directions. At this point, on the porch, and you're talking about aid, to me that's the critical question, aid of whom? So I've never really heard an answer to that question. The warrant is outside with them, the police officers are outside, Mark's inside. Let's assume we're focusing on aiding or protecting Mark. Let's assume that. What's the basis for that then? The basis would have been a welfare call that they got in an interaction that they had on the porch in which Mark denied any intent to inflict harm upon himself. Conducted himself, I think he would... I would conclude that based upon the circumstances of having police officers show up at 11 o'clock at your house with flashlights in your face, I think he was pretty composed. There were no threats, he didn't express no ill will towards anybody, all of that that has made its way into the record was after the entry. I think you have to draw a line with respect to what happened before the entry that reasonably, from an objective standpoint, justified it, and then what happened after which, which is what it is. Well, even before the entry though, I mean, they knew he consumed, or they had reason to believe he'd consumed two bottles of pills. He threatened suicide, he was intoxicated, he might be armed, he was likely to become violent, and then his wife or ex-wife, when asked if she's okay, says no, and then turns to him and says, what did you do? So all of that, like even before they enter the house, all of that transpires. Should they just walk away at that point? He says don't come in, they should just leave? They could have asked Lauren if she was going to consent to their entry. They could have questioned Lauren further about what happened that evening with respect to what he had done or what he had said. They could have picked up her phone and called him. They could have done lots of things. They could have called for backup. They could have talked to him through the door. Or they could have just said, like they eventually did, there's nothing there and they left. Keep in mind at the end of this, they left. So all these concerns that you're talking about at the end of this, I'm sorry, I interrupted you. Counsel, they learn things as the encounter develops. But at the moment they're entering the house, as Judge Larson's pointing out, they have this kind of mix of information, including that he could have been armed, correct? I know you dispute this, right? But that's in the record. Right. What? If we dispute there were guns in the house, that's true. Right. But let me be candid. I think your argument actually gets stronger as this encounter moves past the first few minutes. I don't know that it's good enough to win, but I think it gets stronger, right? Let's say we believe the entry is justified, the use or show of force is justified. What is the test for determining how long they're able to stay in the house? What would your test be? Until they had, first of all, I don't think they should have been there. I understand. Get that part. Don't fight my hypothetical. But I would say the test should be until they've reasonably satisfied whatever suspicion it was they thought they were entertaining. And I don't even know what that was. I mean, truthfully, I really don't know what that was. I mean, that's one of the challenges with this case, is the justifications have migrated. So when you look at the papers that were prepared that evening, the mentions all about mental health stuff and Mark and all this, and then it migrates over to domestic violence concerns. But that wasn't in the file in the beginning. And so, like I say, assuming I knew what suspicion it was they were trying to determine. Suicide. To protect against suicide. With all due respect, I think Mark appeared more out of his mind after they'd broken the door than before he did. Right. And so which way does that cut? Well, they left. They left. So, I mean, in my viewpoint, is it... Do you have a case, counsel, that would show that the 12 minutes or so that they spent in the house was too much to examine and determine and resolve whether this person was a risk to himself? Do I have a case? Yeah. Is there a case? Not, as we thought, a green refrigerator case. I mean, I think... Is that a problem for the clearly established prong of qualified immunity? I don't think so. And the reason is, again, we're dealing with an invasion into a home, which I think is a pretty well-established privacy right. And, you know, I go back to the fact, I think the initial sin here was breaking in the door in the first place. There are lots of things that you... And you look at their SOPs, you know, like a foot pursuit. Do they think this is a foot pursuit? You can look at those. Do they think this is domestic violence? All those things. They always talk about doing the least invasive thing or the least, you know, this or that and considering alternatives and risk assessments and all these kinds of things. None of that was done. I forget my point. But I really believe that the original sin here was breaking in the house. There were lots of things they could have done other than that. And my point is, you know, I may try the case to a jury and the jury may say, you know what, we agree. Officers have reasonable basis and we don't prevail. But my chief complaint is I disagree with the notion, strongly disagree with the notion that the facts only point in one direction. And, you know, we talked here about there are challenges with my story. Well, I got it. But that's what makes a trial. I mean, that's why you have a jury. And so that's really where I come down to on this. Mr. Bonet, you seem to say in your brief and you're alluding to it this morning that because he answered their questions coherently, that that should have been the end of it right there. So you're trying to get us to accept the proposition that with all the knowledge that they have, that can be basically dispensed with by a couple simple answers to questions. And could you elaborate on that? I don't see any cases that say that. And you're almost saying that if somebody's, if you think somebody's suicidal and they say they're suicidal, then that's okay. But if they deny they're suicidal, that's the end of the inquiry. So the Fisher case, the one I was trying to pull, Fisher v. Hardin, 398-837, which is a 2004 Sixth Circuit case. And it says a showing of probable cause in the mental health seizure context requires only a probability or substantial chance of dangerous behavior, not showing actual behavior. And in that case, I believe this is the one, but if it's not this, there are others, that say that in that context, reliance upon an anonymous or a phone call in and of itself without other objective validation or verification of danger signs is insufficient. And so even, it looks like my timer went off. But if we stop right there for a second, you have the additional information that the police had from different sources, and you had the wife say that she was not okay. Those all happened before what you're claiming is the illegal entry into the house. So all I'm trying to find out from you is what's the source of this concept that because he says everything is okay, the police are required to accept that at face value and turn around and leave. Well, I would say the Fisher case that I mentioned, and then there are other cases in that line. But this is not a criminal context. It's a mental health context. And here's the question I sort of come down to, and again, I apologize, I'm over my time, but what was he supposed to do to disengage? He answers their questions. He's calm. Okay? They think they have information about him, but he's wearing loose-fitting clothing. They didn't frisk him. You know, they had no concerns out there. How's he supposed to disengage? Say, I'm leaving now, and now they say, no, you can't? I mean, I don't think that's the way it's supposed to work. And, I mean, he did answer their questions. And I don't think that he demonstrated objectively how he appeared on that porch interacting with them, reasons for them to barge into his house and take further action that they ended up not doing anything about. And I've already exceeded my time. So thank you so much. Thank you. We'll hear from the appellees. Good morning, your honors. May it please the court, counsel. My name is Kyle Vaughn. I represent the appellees, the Oldham County Fiscal Court, and the police officers, Parker Thomas and Tyler Covington. The officers responded to Mr. Ertin's home on February 11, 2022, because Mr. Ertin's mother called 911 and reported that Ertin may be suicidal. After a brief interaction, the officers ultimately made a warrantless entry, and they had their firearms drawn. Now, generally, we know warrantless entries are unreasonable, but as this court noted in Ziegler v. Ackerman, the Supreme Court's crafted that certain exceptions to the warrant requirement, including exigent circumstances. One of the situations that gives rise to exigent circumstances that's implicated here is the risk of danger to police and others. And so the question is, did exigent circumstances exist at the moment of entry? The district court correctly found that it did. And we're here, obviously, asking that you affirm the district court orders below. And the risk was to whom? I think the risk, the police officers testified that they perceived the risk being to everyone on scene at the moment that entry was made. What they knew, uncontroverted what they knew, was the mother had called 911, reported that he was suicidal. He was contacting a strange family, telling them that he loved them, calling his mother crying. He was bipolar, not taking medications, had been drinking. He and his wife had split about a month prior. He'd had friends over that night. They'd been drinking. His wife had come over. We know this, I guess. So these things, to me, could demonstrate a risk perhaps to her, to Lauren, but then when they get there, Lauren's out. I mean, she's not at risk when they get there. And so help me understand your best argument for who was at risk. So the interaction's about 88 seconds long from when they make contact with Mr. Ayrton. 168 seconds into the interaction, she comes out, right? And Thomas says, are you okay? And she says no. Less than 20 seconds later, they're making entry into the home. That no to them signals there may be some domestic violence issue or not, right? She's outside. She doesn't go back in. If he slams the door, which he did, and he's grabbing a firearm, they testified everyone on scene is at risk, including Mr. Ayrton, including her, including the officers. That's why the show of force that they exhibited upon entry into the home was reasonable. Did I answer your question? I just think you're biting off more than you need here. Let me be candid. I think your best argument is that the risk was to him, to Mark, and that's what justified the entry. That's your argument. That's what I'm articulating your argument for. And then the piece that I'm struggling with, again, to be candid, is how long they stayed in the house to determine whether there was an ongoing risk to him. I want to argue that the Fisher case cited by opposing counsel is not the most analogous that the Monday v. Ouellette case is. The plaintiff in the Fisher case was wholly compliant. I do not believe that the video demonstrates that Mr. Ayrton was wholly compliant by any stretch. Compliance? I mean, we're not talking about a crime. We're talking about just trying to make sure he's not going to kill himself. And I agree. The exigent circumstance analysis doesn't depend on the severity of the crime. And I agree, we're not. We're talking about whether those exigent circumstances existed. And then you're talking about the length of stay after they entered into the home. I would argue that they went into the home, that they were trying to ensure that the scene was safe. Mr. Ayrton doesn't just stay put. He's not compliant, which they keep saying, hey, can you just come here? We just want to talk to you. Instead, he keeps squirreling down a hallway. He goes into the, and if they have justification, if they reasonably believe that they're supposed to be there, they're trying to make everything safe, if he disappears over into the back room, that's what they're still doing. They wait for a supervisor to get there. The supervisor asks his officers, you know, what do we have here? And ultimately, they decide, you know what, the scene's safe, back out, and they leave. I think they stayed there long enough to do that, to ensure that he wasn't going to kill himself or start shooting at them. I appreciate this, so what if they had stayed two hours? Too long? Why is 12 minutes appropriate? If Mr. Ayrton sits down on the couch with them and talks with them for a couple of minutes and they decide, you know what, he's not a danger to himself or the rest of us, then yeah, I think the two hours is too long. You said 12 minutes earlier. It's about 12 minutes, I think. And I believe you. I just didn't count it myself. But two hours could be fine if it turns into a, like once they're sitting down and he's like, can I pour you a cup of tea? At that point, the officers don't have to leave, right? It's all very context. Yeah. But if he barricades himself into a back room, that two hours might not be long enough. Might not be long enough, yeah. But what if he does that and he says, I don't have any drugs, I don't have a gun, I'm not going to kill myself, I'm just drunk? Well, the notion that the, and I mean, I know I'm kind of backing a little bit away from where you're going, but the notion that because he said, hell no, I'm not going to kill myself, like a single, that's like one single factor in the totality of circumstances that are supposed to be considered. And just because someone denies suicidal ideation, that doesn't negate all of the other factors that we're supposed to consider. The cases that I kind of noted for that are the Monday v. Ouellette case where, you know, a plaintiff's insistence that he was not trying to kill himself does not defeat probable cause based on other factors. And they're not required upon this denial or an explanation of suspicious facts. Like, it's not, they don't have to ferret that out and investigate that. They're entitled, per the United States v. Schenck case, to rely on their experience of having performed welfare checks before, having interacted with people who are intoxicated before, to assess the credibility in that moment. And that's what they testified they did in the moment. They didn't believe before they went in that he was okay. Once they got in, I agree, he was more agitated than before. And I don't necessarily disagree with his contention that, you know, if the police are in his house and when the police are in your house, that kind of makes sense that you'd be more agitated. I think they stayed in until they were satisfied that he wasn't a danger to himself or others. And no more than that is okay. But up until that point, it is. You asked what the test would be. That would be my test. Moving to, well, I'll ask your honors, is there a place you'd like me to go other than where I'm going at the moment? I'll just keep talking. So I've already covered the fact that we argue it's a show of force, not a use of force. Do you think that makes a difference in our case law? Like, in other words, don't we have cases that say that drawing a weapon on someone can be excessive force? Yes. So what's – is there – are you saying there are distinct tests for show of force versus excessive force? Or is it just a show of force is on the lesser end of the use of force, but we analyze it all under a totality of the circumstances? Well, I pointed out for A, the distinction between actually using force and showing force. It was pointed out in the briefs that they testified – the officers testified that they had used force. They actually clarified their testimony and said it was a show of force. And I pointed it out because, look, this court has found that it can be reasonable in order to abort a potentially violent situation. That's the Collins v. Nagel case. And in this point – in this case, the point is their show of force was a reasonable thing to do to abort what they perceived to be a potentially violent situation. Right, but do we still analyze that under the Graham factors? Or are you saying we don't use the Graham factors as long as nobody ever uses their weapon, their firearm, their taser, whatever? If they are just displaying it, we don't use the Graham factors? I still think that you use the Graham factors. Okay, okay. Yes, absolutely. And thank you for the segue. Moving to the Graham factors, despite the assertions to the contrary, the officers testified that, as I said, that they drew their weapon in a show of force. As far as we believe, even though the district court found that the first factor was inconclusive, I actually believe that the factor one weighs in favor of the officer. The welfare and domestic violence checks are inherently dangerous, as noted in a plethora of case law. In addition, you have reports of potentially violent behavior. The person doesn't like police officers. There's a mental and emotional state there that are factors to be considered. And the inquiry as to the severity of the crime on that first factor does start with whether the crime is a felony or a misdemeanor, but it doesn't just end because the crime is a misdemeanor. If there is a serious or a life-threatening situation that the plaintiff's conduct is exacerbating, that raises the severity level, and we absolutely have that here. We believe that all three factors weigh in favor of finding that their show of force was reasonable. The notion that there wasn't an immediate threat, I already went through kind of the timeline there at the beginning, and in less than 20 seconds from the time she says no to all of the other factors that they have in their sphere of knowledge, they went through that door and showed their firearms to respond to what they perceived to be an immediate threat. I think that's what they testified to, and I think that that is fairly clear from the video, as counsel alludes to, and what we put in the briefs. Moving to qualified immunity, the plaintiffs cite USP Johnson and argue that, like in Johnson, she was outside. But unlike Johnson, Yurton here, the alleged perpetrator, wasn't just on the scene. He was in the home, and we find Johnson to be very distinguishable. They testified, again, that they believed everyone on scene was at risk when they made that entry, and that's why they made the entry. Moving to this notion of ministerial duties, first of all, the SOPs are general guidance. At the end of the day, the Fourth Amendment is what controls the analysis, and I don't think there's any real dispute about that. They both testified that they entered the house not just because of the suspected domestic violence, but also because they thought that Yurton was a danger to everyone. Probable cause is discretionary, the determination of that probable cause. Determination of exigent circumstances is discretionary. And so I just don't agree with the SOPs created this ministerial duty. They provide that general guidance, but they still require officer discretion in their application, and their evolving explanations reflect the complex nature of the encounter rather than bad faith, and they were ultimately acting to ensure all of the safety for the parties involved. That's what they testified to, and I don't believe there's any evidence to the contrary. Finally, as to the Monell claims, I believe that the district court got it right. And I believe there's an attempt to introduce evidence that they didn't have before them at the time, which I think is improper. They didn't plead what was necessary in order to substantiate those Monell claims, and I think that they were appropriately dismissed. Specifically, they argued that the department ratified Thomas and Covington's actions. That has to be an official with final decision-making authority. No such official was identified in the complaint. They argue that there's this policy of toleration. In order to do that, you have to show a clear and persistent pattern of illegal activity, municipal approval, and that the custom was the moving force behind the violation. No such facts were pled, only that the actions in this singular incident suggest toleration and or acquiescence, and that the inference is plausible. They argue that inadequate supervision and training exists as a de facto policy. They haven't pled any facts regarding the physical court's alleged failure to properly train Thomas, Covington, or other officers, nor have they pled any facts to connect the purported lack of training to any constitutional injuries. They now attempt to introduce evidence to this court that was not available to the district court when the ruling was made. Ultimately, the district court's granting of our motion to dismiss was proper, because they failed to adequately state a claim against the physical court. Their granting of our motion for summary judgment was proper because exigent circumstances existed as a matter of law, and the officers are entitled to qualified immunity. We respectfully ask this court to affirm the judgments of the district court, and I appreciate your time. Thank you. We'll hear rebuttal. Mr. Baum, during his arguments, characterized to you that Mr. Erden slammed the door. I don't think he did. I mean, I think if you look at the video, he didn't slam the door. He wasn't stumbling around the porch. The characterizations that they base a lot of their case on just simply aren't validated by the videos, and that's my point. I will agree. So Mr. Vaughn submitted to you two cases that he said, well, I told you one, which was Fisher v. Erden, and he mentioned Mundy v. Ouellette. And I agree. I think those are instructive cases. And I would invite you to consider the facts known to the officers before the entry, okay, particularly the objective facts demonstrated to them by their interaction with Mark, and even with Lauren, against the facts in both of those cases, and see which ones they measure up to most closely. There was no threatening behavior. There was nothing that indicated anybody was in any danger. And then, I guess my last, well, I've got more time than I thought. I think the problem with your Fisher analogy is Fisher doesn't have any of the other extrinsic things that these officers knew from dispatch when they showed up at the house. That record is absent. So that they were told from dispatch. And I think that's my point, is that I think that's part of the myth. I think that the facts, I think they're entitled to have information. I'm just commenting on, you think the facts of this case are closer to Fisher than they are to Mundy. And it seems like the facts in this case are not close to Fisher at all. Well, I don't think they're close to Mundy either. And I think that's, you know, we could debate that. If we're in a gray land, this is a qualified immunity case. If we're in a gray area between these cases, this is a qualified immunity case. So it's on the plaintiff to show that it was clearly established that they couldn't do what they did. And I predicate that again upon the entry, which I think that's the original sin in this case. We can argue, and we have argued, that after the entry, which was without a warrant, and I would submit to you and continue to submit, was not justified by exigent circumstances, at least not by facts that point in one direction. But after that, I mean, there are questions of fact, whether the use of force was justified or excessive or whether the detention was too long. I think those are all facts. And, you know, what we're asking for is our day in court, quite frankly. And, you know, I really don't know what else to say. It's hard as that. You know, you've heard facts that I acknowledge point against me. But when you look at the district court's opinion, they didn't even pay lip service to the points that pointed for us. And I think that when you have those going together, that you say, well, I'm not so sure. And when you say, well, I'm not so sure, you end up in front of a jury, which is where I think we should be. Thank you all so much.